<hr/>

(95 South. 800)

No. 23862.

**EDWARDS & BRADLEY v. COWAN KERR LUMBER CO.**

(Feb. 26, 1923.)

*(Syllabus by Editorial Staff.)*

1. **Logs and logging** ⟜10(½) — **Purchaser should have insisted upon correct method of scaling, instead of waiting until timber was cut and lumber sold and shipped.**

Under contract for sale of timber, providing for selection of scaler by seller, purchaser should have insisted, at the time, on his complaint that the scaling was not being correctly done, and required a correct method of scaling, instead of paying statements as rendered, and waiting until the timber was cut and most of the lumber sold and shipped.

2. **Logs and logging** ⟜3(10) — **Buyer not entitled to complain that seller cut timber in its operations which buyer thought should have been left for it.**

Where contract conveying all pine sawlogs provided that seller's operations in cutting piling, cross-ties and cordwood were not to be interfered with, but were to have preference, and buyer was to follow in behind such operations, buyer *held* not entitled to complain that seller cut for piling or "waling" timber which it thought should have been left for sawlogs.

3. **Equity** ⟜13 — **Court cannot change contract because operating harshly.**

Though contract for sale of timber providing that seller's operations in cutting piling, cross-ties, and cordwood were to have preference was a *severe one for the buyer*, where it voluntarily accepted such contract, the court cannot "soften" its terms from equitable considerations.

4. **Appeal and error** ⟜1073(9) — **Change in judgment without new trial held of little importance, as Supreme Court could render proper judgment.**

That trial court, without granting new trial, rendered formal judgment different from the decree contained in its opinion, is of little importance, since the Supreme Court can render whatever judgment it may find proper.

Appeal from Twenty-Sixth Judicial District Court, Parish of St. Tammany; Prentiss B. Carter, Judge.

Action by Edwards & Bradley against the Cowan Kerr Lumber Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Benj. M. Miller, of Covington, and A. Sidney Burns, of Ponchatoula, for appellant.

A. D. Schwartz, of Covington, for surety, John A. Stanga.

Robert R. Reid, of Amite, and Lewis L. Morgan and J. Monroe Simmons, both of Covington, for appellees.

DAWKINS, J. Plaintiff alleged that on the 29th of June, 1917, it was the owner of

all the pine timber upon certain described lands, and that on said date it entered into a contract with defendant by which the latter was granted the right to cut and log timber from said land, for which it was to pay at the rate of $6.50 per thousand on the 10th of each month for all timber cut the month preceding; that defendant had, during the months of November and December, 1918, cut and removed timber to the value of $4,787.30, for which it had not paid, and that in addition thereto defendant was due it the sum of $773.28, as interest upon the value of certain other timber, during the time it remained uncut, as stipulated in said contract, which indebtedness defendant had admitted to be due; that plaintiff had complied with all of its obligations under said contract; and that defendant had agreed to erect and equip, for the purpose of manufacturing said timber, a sawmill and all necessary appurtenances, and to keep the same free from incumbrances.

Petitioner further alleged that it was the owner of said sawmill, all of its equipment and appurtenances, having acquired the same by purchase on August 30, 1917. Further:

"That said title was made, signed, and delivered to and in favor of the said Edwards & Bradley by the defendant company to guarantee and secure on its part a faithful observance of and a strict compliance with all of the stipulations, covenants, and agreements incorporated into said contract."

Plaintiff further alleged that by its failure to "fulfill and live up to the terms of said contract," defendant had forfeited to petitioner all of said property so sold.

Petitioner also alleged that it had a lien and privilege upon said property, and was entitled to a sequestration to protect its rights in the premises.

Petitioner prayed that a writ of sequestration issue, and that the mill, lumber, live stock, machinery, etc., be sequestered; that it have judgment recognizing it as the owner of said property; or, in the alternative, that it have judgment for the sum of $5,560.58, with recognition of plaintiff's lien and privilege upon the property seized.

Defendant admitted the purchase of the timber as alleged, but averred that it had paid therefor in full. It also reconvened for the sum of $12,507.40, claimed to be due because of overpayment, and for the value of certain timber alleged to have been conveyed under the terms of the contract, but which was cut and used by the plaintiff.

In a supplemental answer, defendant alleged that it was intended under the terms of said contract for the sale of the timber that plaintiff was to continue "ordinary and usual piling operations," which included only trees under 16 inches at the butt and tapering not to exceed 8 inches at the top, and did not embrace trees suitable for sawlogs; and that many of the trees used by plaintiff were pointed out to defendant as available for sawlogs, and as an inducement to make the original contract.

There was judgment for plaintiff for $5,560, and sustaining a lien upon all of the property sequestered, "except as to the wagons, oxen, mules, and teams."

Defendant has appealed.

## Opinion.

As a decision of this case depends upon the interpretation of the original contract between the parties, we quote its pertinent provisions, as follows:

"That for the consideration and upon the prices, terms and conditions hereinafter set forth, and in consideration of the premises and agreements herein contained, the parties have covenanted and granted as follows:

"(1) The vendor (plaintiff) hereby sells and agrees to sell, and the purchaser (defendant) hereby buys and agrees to buy all of the pine sawlogs standing or lying on the vendor's present timber holdings situated in the parish of St. Tammany, state of Louisiana, upon the property known as the Thomas & Parker tract, Jones & Pickett tract, said property being

more fully described as follows: [Then appears detailed description of the land.]"

In the second paragraph, the purchaser agreed to pay $6.50 per thousand feet for the standing timber and $3.25 per thousand for the down or dead timber, on the 10th day of each month following the cutting; and in paragraph 3 it was agreed that not less than 20,000 feet per day or 400,000 feet per month should be cut, cutting to commence on or before September 1, 1917. Section 4 required that the purchaser should pay for a minimum of 400,000 feet per month at $6.50 per thousand, or $2,600, whether cut or not.

Section 5 was as follows:

"(5) That the purchaser agrees and hereby binds itself not to interfere in any way with the piling operations conducted by vendor on said lands, and to give precedence to said operations, including installation of switching facilities, rights of way, and all other features essential to the proper conduct by the vendor of its business of producing, hauling, loading and shipping piling, cross-ties and cordwood from the said tract of timber, always following in behind the piling operations of the vendor, unless special permission is obtained in writing from the vendor to log in ahead of the piling operations aforesaid.

"(6) It is further understood and agreed that the vendor shall employ the services of a competent log scaler for the purpose of scaling all timber logged by the purchaser, the method to be employed shall be the latest improved log scale as adopted by the state of Louisiana, all timber to be scaled on the basis of sixteen-foot logs; the salary of the said log scaler to be paid by the vendor, fifty per cent. of which salary or wage is to be borne by the purchaser."

Section 7 was eliminated by mutual consent.

Under section 8, the purchaser (defendant) agreed to erect, promptly, at a point to be designated by the vendor (plaintiff), a modern sawmill, with all necessary equipment of 25,000 daily capacity; and in like manner a substantial logging railroad, as might be necessary, to transport the sawlogs to the mills.

By section 9, defendant agreed to convey to plaintiff said mill, equipment locomotives, cars, logging road, buildings, etc., as soon as the installation of said "sawmill is commenced, and to remain in effect during the life of this contract and until this contract shall have been fulfilled." The property was to be kept insured with policies in favor of the plaintiff, and in event of destruction by fire, the proceeds were to be retained by the plaintiff in payment of any sum due it; and the balance, if any, to be supplemented by the defendant and the plant rebuilt. The purchaser or defendant also bound itself to carry employer's liability insurance, during the life of the contract, and to hold the vendor harmless on account of any action for damages by the employees of the purchaser.

Section 10 gave the vendor the right, in event the purchaser failed "for any cause whatsoever * * * to comply with the terms of this contract," to take over operation of the plant, logging road, equipment, etc., and continue the same until all of the timber covered by the contract had been manufactured into lumber, without any liability to defendant therefor.

Section 11, dealing with the interest claim, is not contested.

Section 12 bound the purchaser not to acquire any tracts near or adjoining the tracts covered by the contract, and any purchases so made were to be by and for the vendor; the vendor agreeing to sell to the purchaser, "on the same terms and conditions, * * * any small tracts of timber consisting of 50 acres more or less," that it might acquire adjacent to or adjoining its present holdings in the parish of St. Tammany, during the life of the contract, provided there was a reasonable margin of profit between the purchase price for such additional tracts "and the herein contract prices."

Section 13 warranted that the purchaser was a corporation with a subscribed stock of $5,000; and under section 14 it agreed not

to assign or transfer "this agreement, in whole or, in part, and no part of the work herein provided for except the logging, felling, cutting, skidding and loading, shall be sublet, without the written consent of the vendor."

Section 15 bound defendant to keep all of its property free of incumbrance.

Section 16 provided that the breach by the purchaser of "any of the obligations of this contract" would authorize the vendor to enter upon the premises for the purpose of minimizing loss and injury, and to demand "the rescission of this contract and damages for the breach of same. The same right is accorded to the purchaser."

Plaintiff has not answered the appeal, and the judgment below, which in effect denied its principal demand to be recognized as the owner of the property sequestered, has become final to that extent; its claim before this court resting exclusively upon the alternative demand for balance due upon the timber cut, and recognition of its lien and privilege upon the property sequestered.

Defendant's attack upon the judgment below may be considered under three heads, to wit:

(1) Overpayment for stumpage cut, on account of an alleged improper scaling of the logs;

(2) A demand to be reimbursed the value of 110 sticks of timber used by plaintiff for "waling timber," which it is alleged belonged to defendant under the contract valued at $65 each, or $7,150; and

(3) A claim for approximately 400,000 feet of "best sill timber," upon which a profit of $10 per thousand, or $4,000, is alleged could have been made.

[1] 1. As to the first contention, one of the provisions of the contract quoted above provided that a scaler should be selected by the plaintiff, whose salary was to be paid one-half by each of the parties, to scale the tim-

ber on the log ramps at the mill, copies of the scale to be supplied both vendor and purchaser, and payment to be made on bills rendered each month based thereon. This was done, and defendant made payments accordingly for all but the last two months, November and December, 1918. From time to time, defendant made complaint that the run of the mill was not showing the customary excess of 10 per cent. or more lumber over the log scale, and that the scaler was including the thickness of the bark on both sides of the logs in the measurement of the diameter. However, there was considerable evidence to show that this excess run of lumber over log scale depends upon the size and character of the timber, and particularly upon the skill and care with which the lumber is sawn; and that in the present case a great deal of timber was wasted by unskilled sawing. But the most conclusive proof that the work of the joint scaler was fair and reasonably correct is that for about half the time defendant employed a scaler of its own to scale behind the one employed jointly, and in all but one or two instances, the former's figures exceeded those of the latter, and in these few instances there was a difference of only a few feet considering the quantity of logs scaled.

In these circumstances, it seems to us that the complaint, if serious, should have been insisted upon at the time, and a correct method of scaling required, instead of paying the statements as rendered, and waiting until the timber was all cut and nearly all of the lumber sold and shipped. It is true that defendant's officers say they did not do this because, under the harsh terms of the contract, plaintiff could have interfered with or prevented defendant's operations; but the lower court was not impressed with this contention, and neither are we, since it is not denied that the defendant offered to pay the sum claimed by plaintiff if the latter would

accept $1,000 cash and take a plain note for the balance.

[2] 2. Defendant contends that the "piling operations" mentioned in the contract in paragraph 5, quoted above, did not include "waling" timber, and for this reason, 110 sticks of large timber used by plaintiff for that purpose should have been left for it (defendant), from which a profit of $65 per log or stick could have been made.

The record discloses that defendant was anxious to obtain such of the tract of timber as might not be required by plaintiff (which was then engaged upon the same land in getting out piling, cross-ties, and cordwood) for its own purposes, and initiated the negotiations which finally culminated in the contract. Defendant seemed willing and in fact did accede to almost any terms and conditions which plaintiff saw fit to impose, even conveying by deed its sawmill property, equipment, etc., to plaintiff to insure performance of its obligations. At least one of its officers went upon the land before executing the contract and saw the nature of the work being done by plaintiff, which included hewn piling or waling timber (waling timber consisting of hewn timbers of the size approximately of the tops of the piling and applied horizontally in fastening or steadying the piles after they are driven into the earth); and in order to avoid conflict or controversy as to which trees should be used by each in its respective operations, it was expressly stipulated that plaintiff should have "preference" in cutting its piling, cross-ties, and cordwood, defendant always "following in behind such operations" unless written permission was obtained from plaintiff to do otherwise.

[3] Defendant contends that, inasmuch as the contract, in its conveyance clause, declared that the vendor had sold all of the pine sawlogs, this included all timber which was capable of making such sawlogs; and that only such trees as measured not exceeding 16 inches at butt and not more than 8 inches at the top were reserved for piling. If the expression relied on were the only one touching the matter in the agreement, there would be great force in this contention; but the language preceding that in question clearly shows that the conveyance was subject to the "considerations and upon the prices, terms and conditions hereinafter set forth and in consideration of the premises and agreements herein contained." If there is any one thing made clear in the correspondence preceding, as well as in the contract itself, it is that the plaintiff should not be interfered with in its piling operations; and while, as heretofore indicated, the contract was undoubtedly a severe one for defendant, it was at liberty to consent thereto or not as it saw fit, and having chosen to accept the same, it became the law between the parties, and the court is not authorized to "soften" it from equitable considerations. As a result thereof, defendant manufactured about 8,000,000 feet of lumber out of which it no doubt made a good profit during the years of 1917 and 1918, and it is now too late to complain after the whole subject-matter has become an executed and completed transaction.

3. What we have had to say with regard to the claim for timber used for waling timber is equally applicable to that for the profit on 400,000 feet used for piling which defendant claims should have been left for its sawlogs. It must be remembered that the defendant was required to pay and did pay, for such timber only as was received and scaled at its mill, at the rate of $6.50 per thousand feet, and the case did not involve any estimate or lump sum price for timber which it did not receive.

We think, as did the lower court, that the contract was executed in compliance with a reasonable interpretation of its terms, as well as the intention of the parties when it

was made; and that plaintiff is entitled to recover the sum allowed below, with recognition of its lien and privilege as decreed by the judgment appealed from, and resulting from the pignorative contract conveying the property to plaintiff as security for the performance of defendant's obligations.

[4] Complaint is made because while, in the opinion handed down by the lower court, it was decreed that the plaintiff have judgment for $5,560.38, and perpetuating the writ "in so far as the property sequestered was owned by defendant at the time of the execution of the deal * * *" or pignorative contract, the formal judgment, prepared and signed two days later, was for $5,560, and there was recognized a "lien and privilege upon the property sequestered * * * except as to the wagons, mules and teams." The contention is that substantial changes were made without granting a new trial, which the lower court was powerless to do. However, this makes little difference, since this court could, within the limits of the judgment appealed from, render whatever judgment it might find proper.

Finding no error in the judgment appealed from, the same is affirmed, at the cost of the appellant.